First case of the day is People v. Sanders for the appellant, Mr. McCarthy, and for the athlete, Ms. Johnson, may it please the court. Your honors, counsel, may it please the court. My name is John McCarthy, and I'm with the State Appellate Defender, and I represent Derry J. Sanders, Ms. Cox. This case raised two issues. I'm going to begin by discussing the second issue I raised, which is the application of the rape shield law to the facts of this case.  One, the complaining witness's prior sexual activity, and the complaining witness's reputation. The evidence at issue in this case, the text messages and the explicit conversations, are neither of those, fit into neither of those exceptions. Before I get into the legal part of my argument, I'd like to give a little background to show the timing of the text messages and what was going on and stuff like that. Breanna went to the Fat Jack's bar at midnight one night with a friend, Paige. She went to the bar and she knew my client, who was a bartender there and a manager, and she went to where he was because he would often give her free drinks. She says that night she had between five or six Coronas and five or six shots of Grey Goose. My client says he can remember giving her three or four Coronas and maybe one shot. Now both of those could be true because there's three bars in Fat Jack's, so she may not have gotten all her drinks from my client. Well, Breanna remained at Fat Jack's after closing and she had conversations with both my client and Nick LaComba, a bouncer there. Nick left about three o'clock in the morning after he got paid, and Breanna and Jay took a taxi to his house shortly after that. Now between two and approximately 4.30 in the morning, I believe, there was a series of about 20 text messages between Breanna and Nick LaComba, both while he was at work and while he was at home. Some of those were sexually explicit. At about 4.30 in the morning, Breanna called Nick LaComba. Why does the, given the charge in this case that the victim is unknowing, is unable to give knowing consent, why does the nature of the communication, why is that important as opposed to what the judge found that the pertinent matter is her cognitive ability to communicate back and forth and what she was able to say? For instance, assuming for the moment that it sounds like she's interested in having sex with the guy to whom she was texting, why would that be any more pertinent than the question of her cognitive ability than if she said what the communication was, are you going to be able to drive me to work the next day or what's the matter? I believe in this set of circumstances, the content of the communications go to her state of mind. Now I know what the danger is, everybody says, well simply because she wanted to have sex with Nick LaComba doesn't mean she'd want to have sex with your client. And I agree that's the general rule. But I would compare this to the general rule, let's say, in other crimes evidence, where you generally cannot introduce evidence of other crimes to prove that this person has the propensity to commit crime. And obviously you can't introduce this evidence, say you want to have sex with Nick, you're going to have sex with Jay, however it can be brought, other crimes evidence can be brought in for limited purposes. One of those limited purposes is to give a continuing narrative of what was going on that evening. And we can avoid, and I think that's what's going on here, it should come in as a continuing narrative. And we can avoid the risk of the jury making that leap, well if she wanted to have sex with Nick, then she wanted to have sex with Jay, by offering the eliminating instruction, like we do in other crimes evidence. This evidence is not being introduced to show that simply because she wanted to have sex with Nick, that she would have sex with Jay. It goes to her state of mind during the evening. Well, it would be probative, arguably, if this were a case where the defendant claimed she wanted to have sex with me and she said no I didn't, that's not really what this charge was. It was her inability to give knowing consent because she was drunk out of her mind, essentially was the state's theory, wasn't it? Yes. So, whether she had cognitive ability was really the issue, and as the trial judge said here, it seems like Judge Freitag seemed to strike a balance where the jury was entitled to hear, the defendant was entitled to bring out her communications that are timely pertinent about the extent of her ability to communicate, but not to consistent with the rape shield statute, not to bring out that she was interested in having sex with a third party. Why isn't that a good balance? Well, in this particular case, I think it comes down to the stories of the two individuals involved. Brianna, when it came time to go to bed, my client offered her the couch and offered her money for a taxi home, and Brianna said, no, I want to go, where do you sleep, let's go there. And Brianna gets in the bed, my client gets in and spoons with her, basically, and puts his arm around her, and at that point is where their stories diverge. Brianna says she fell asleep and woke up to my client having sex with her. My client says that she started to fondle his penis, and so I think it goes to her state of mind, she spent these two and a half hours texting back and forth with Nick Vekomba, she was in the mood to have sex. Now that's not saying, like I said, that just because she wanted to have sex with Nick, that she wanted to have sex with my client, but I think it does have more probative value than prejudicial effect. What if she was a prostitute, and we knew, I mean, there's no dispute about that, and she negotiates on the phone with Vekomba, and they don't come to an agreement, but the texts show she apparently has the wherewithal to, from the defense perspective, look, she has cognitive ability, she's aware of what she's doing, would it be admissible that she was negotiating for sex for money? I mean, that obviously shows a willingness that day or that evening to engage, but would that be admissible? I don't know. I understand that's a hypothetical. I think it possibly could, under the same circumstances, it's happening in real time while she's with the defendant in this case. At a minimum, the fact that she was on the phone talking about having sex, I think would be admissible, because it would go to her state of mind. Well, as the state points out directly in its brief, citing Ivelisse Santos, which is an interesting case to cite for this point, because it was a case where the rape shield statute was at issue. There was an evidentiary ruling. Don't we have to conclude that the decision of Judge Freitag in this case, the balance he struck, was arbitrary, fanciful, or unreasonable in order to agree with you and reverse on this basis? I think it was wrong as a matter of law, especially when you think of it as an evidentiary ruling. I understand. When you talk about erroneous as a matter of law, that's it. Because the rape shield statute does not apply to either of these situations. It's not reputation testimony, and it's not conduct. It has no application whatsoever, so it is wrong as a matter of law. So if we think it applies to communication, you lose? Communications in this context? Such as what occurred here. I'm not sure of the distinction you draw, but if we don't agree with that distinction, this case is over. It would be very difficult to win on this point. Part of the problem of what happened in this case is, well, there's one particular text I'd like to go to that I think supports my position. And it's the one that was sent at 421 in the morning. It starts out with, well, I went home with Jay since you couldn't decide. And then has some sexual explosive language. That could be an attempt to get Nick jealous, to get him to come over and pick him up. It could be, you know, I was, you know, I wanted to have sex with you, but since you wouldn't, I went home with Jay. And the state uses that same text in a twisted manner to take the rape shield law and turn it into a sword, which I think made trial unfair. The state asked Nick to come to these next questions. And in those text messages, you learned that she was at the defendant's house, correct. And it was clear from the text messages that she did not want to be at the defendant's house. I wouldn't say it was very clear. It was clear to you she didn't want to stay at the defendant's house. In fact, she asked you for a ride. That made it look like these text messages were simply about trying to get her out of that house because she did not want to be at Jay's house. And that's not true. The entire text message that I did with 421 is, well, I went home with Jay since you couldn't decide, dot, dot, dot. Therefore, come pick me up, take me to my apartment, and I'll give you a ride. It shows she still has a sense of humor. You give me a ride, I'll give you a ride. Coherent thoughts. She's in the mood. And yet the state leaves the jury with this belief that she just wants out of Jay's house at any time and she's desperately trying to get Mr. LaComba to pick her up. My client's theory of the case, in order to get a complete picture of my client's theory of the case, these text messages were important. His theory was, Brianna was drunk the night of the sexual encounter but not too drunk to consent. She got angry the next day with Jay because he did not acknowledge Jay had sex, failed to hug or kiss her or thank her for the good time. And that's exactly what she told police several days during the second interview because I think the first interview wasn't recorded properly. How did the evidence that Judge Freitag wouldn't let in affect the argument one way or another that you just made? It goes into, once again, showing... How would it have strengthened it, in other words? If that was the defendant's theory, that's how he said the evidence should be viewed and the text messages showed some, certainly, question about her cognitive ability why would suggestive messages to the recipient about having sex added to that defendant's theory of the case? He asked his theory of the case in respect that it goes through a state of mind that... You keep saying state of mind, but I don't understand what that means. The state of mind at issue here is her cognitive ability. That's the only one... We're not talking about whether she willingly consented. The state didn't charge him. He didn't go to trial. He claimed that he forced her to have sex against her will. So what part of state of mind are you referring to beyond cognitive ability? The problem in this case is her claim goes beyond that I was too drunk to consent and my cognitive ability. She claimed she was asleep. My client claimed she was fondling him. Her state of mind offers support to my client's theory and when you add what she told police several days later that she was upset with Jay because he acted distant and hugged her, didn't kiss her it all helps my client's theory. Even if one juror took the evidence as presented. And said it doesn't matter if Brianna was asleep or if Jay was fondled by her. She did not want to be at that house. We know because the state introduced that evidence. So she had to be too drunk to consent even if she did fondle him. Because just an hour later she's having sex with a guy that she doesn't want to be at his house. Even if you give the text messages a slightly different interpretation it's pretty clear she preferred, she would have preferred based on the evening and circumstances to have gone home with LaComba. I agree. What does the jury already think of Brianna? Caging drinks from her favorite bartender but at the same time apparently flirting with and later texting. The jury is probably thinking they're not texting about their plans to make a business trip to Indianapolis the next weekend. They weren't informed that they were flirting. What about at the bar? No. The jury was not informed she was flirting with LaComba. What was she flirting with the bartender? If she was flirting with Jay, obviously. They had no information there was anything sexual through conversation, text, flirting or anything that was going on between LaComba and Brianna. She then began communicating with him. The only thing they know it was about was come get me I'm at Jay's house. All that information is in the vacuum. Picking up on Justice Connick's point it's pretty clear under the circumstances that she is not wrestling with whether to enroll in a nunnery or not. If there would be such a term in 2015 it comes across as a loose woman, doesn't she? From what's going on in the bar and what she said and how she's acting? Regardless of whether that's appropriate to think of it that way. I think in this day and age I don't think people think twice of it to be honest with you. Women have the right to... Probably not, which is why this isn't a question of did she consent or not. This is a question of the statute has been changed that she's drunk out of her mind and essentially passed out so she's incapable of consenting. You can't have sex with someone. That's what the statute says. The defendant is alleged to have violated that provision not forcing her against her will to have sex with him. So it's her cognitive ability which is at issue when she says gee I essentially was drunk out of my mind I wake up and this guy's having sex with me and I never consented to it when he started to do this. And my client, his defense is she did indeed consent by fondling him. He's not saying I didn't know she couldn't consent. He has brought out an outright she consented defense and this evidence goes directly... So his defense is she wasn't passed out. Right. And she fondled him. And so his defense is there was consent and so the fact that she was in the mood to have sex... That's not so much consent as it was she wasn't passed out. She was aware of what she was doing. And the manifestation of her awareness was she was stroking him and interested in having sexual relations. And the phone calls such as Judge Freitag let in are supportive of the defendant's theory on her cognitive ability in a timely fashion. The jury heard that. You just say the jury should hear is what's the... And she said in one of these if you want to get laid come get me. How does that... The jury could probably figure that out anyway but how does that change the cognitive ability aspect? It changes because in this case she's not just saying I was tumbling drunk she's saying I was asleep. If she was asleep she couldn't have consented under either prong of the sexual assault statute. I don't believe somebody asleep is capable of consent.  I think this evidence is very probative. I don't think my client had a fair trial because of it. I think the text messages were misconstrued for the jury so that they would think that she was desperate to get out of the house so there's no way she would be stroking a defendant or my client if she doesn't want to be there anyway. Their whole theory was that my client tricked her to get her to his house. I want to make sure I understand your theory about the rape shield statute. It's your position that we aren't supposed to view this issue as a matter of an evidentiary ruling subject to the trial court's discretion but that it doesn't apply at all to sexually explicit conversations which might be conducted in a timely fashion? If those conversations do not entail past sexual conduct that actually occurred it's not reputation testifying. The rape shield law doesn't apply at all as a matter of law. I see my time is up. If you have a question about the other issue I'll be glad to answer it. You can reach that on rebuttal. I actually would like to start by first addressing a forfeiture that happened in regards to the Batson issue. As you're aware from the briefs the defendant did not address the forfeiture of his failure to address the Batson claim in his initial brief and therefore he also didn't set forth a plain error analysis. Nonetheless I addressed the forfeiture and I set forth a response to the plain error analysis that was not made. In reply the defendant contended that the state is subject to forfeiture and therefore he was not required to raise plain error until and unless the state first raised it. Now I fully recognize that forfeiture is a bar on the parties and not on this court and I fully recognize that forfeiture is applicable to the state as well as the defendant. However, as has been frequently stated Supreme Court rules are mandatory directives and not suggestions and Rule 341H7 plainly states that an issue not raised in the initial brief is not to be brought up in reply and is not to be brought up in oral and therein lies the rub. Therefore a situation has been created where a defendant is not being held to comply with mandatory Supreme Court rules. They are turning forfeiture on their head and they are saying regardless of what the mandatory rules state it's the state who must first bring up plain error in their brief before I am responsible or required to bring up forfeiture and plain error in mine because forfeiture applies to you. What is left is a situation where defendants are regularly ignoring their forfeiture, ignoring their responsibilities under plain error and waiting to see if they can catch the state in a gotcha moment because the state didn't catch them to begin with. If they are caught then they will address it in reply which is a violation of the Supreme Court rules. If the state does catch it, the state is put in the position of fulfilling defendants burden by being the one to first bring up forfeiture and plain error and we again are put in the position of having to address plain error based on what we believe their argument will be when it inevitably comes in reply and that is exactly what happened here. So your position is that it's incumbent upon the defendants if they wish to raise an issue that hasn't been properly preserved for whatever reason at the trial level to acknowledge that it was forfeited at the trial level because of failure to raise it and then argue in their initial brief that it should be considered by this court anyway under plain error? Yes, Your Honor. Go ahead. So mainly because in this brief the argument was I don't have to address it until reply because state is subject to forfeiture. Of course it's pretty convenient then as well because you don't get an opportunity to respect. Correct. So to the extent that reply suggested that that practice of waiting to see if they can catch the state for failing to catch their burden, I simply want to suggest and state that I think it's not only inappropriate but it's contrary to mandatory Supreme Court rules. It's not my job to point out their forfeiture in plain error. It's their job to point it out. I would like to then move to Batson. In Batson in this case the defendant took three different approaches. At the trial the defendant failed to include the Batson issue in his post-trial motion and it was forfeited. In his initial brief he for the first time argued the seven Rivera factors and said that the trial court prevented him from making a fuller argument. Now in his reply brief he is arguing that the trial court is the better place to argue the seven Rivera factors that he set forth in his initial brief and that the trial court failed to properly guide him through the process by coaxing him out of arguing the seven factors. For my part I'm asking the court to find that the defendant failed to carry his burden under the first step of establishing a prima facie evidence of discrimination and I'm asking you to reconsider your ruling in Shaw of which I realize Justice Steigman was the only member of that panel where the suggestion was that a trial court is required to respond to Rivera factors even though the defendant never made Rivera arguments. The Illinois Supreme Court in Rivera plainly held that the mere number of African Americans who are challenged without more will not establish a prima facie case of discrimination. How then, as Shaw suggests, can the mere number of African American jurors without more possibly get you a second bite of the discrimination apple if the trial court fails to address the factors you didn't bother to argue? It can't stand for both. You're suggesting that this is almost analogous to your argument about the briefs in the sense that you make a kind of a very minor Batson reference and challenge and only mention numbers of and don't bother to point out the other factors that you really should want the court to evaluate. And respectfully, the Supreme Court is, I believe, on my side on this. If you read Rivera, Rivera meant what it said. And what Rivera said is that it is the moving party who has the responsibility to establish that prima facie evidence of discrimination. In Rivera and in Davis, which are two cases that were largely relied upon by this court and Shaw, it was the court there that was the moving party. And the Supreme Court was careful to differentiate the responsibilities that come when it's a defendant making that challenge versus a trial court making that challenge. So is Shaw wrong, distinguishable, or dicta on that issue? Wrong. You don't want to give us an opportunity to distinguish. And I know Justice Steigman was on the panel that was the iceberg to my Titanic but I found a lifeboat and I'm here to try this again. The Supreme Court said that it's when the court makes this argument that the court is responsible for making the record because it's the court's findings that are going to be reviewed to determine if it's carried their burden, the burden the defendant usually has to carry. But because it's the court that has to make this record, it's essential that they articulate those findings. At no point, though, in Rivera and Davis did the court even slightly suggest that the trial court is to articulate all of those Rivera findings in all cases. And it certainly was never the slightest suggestion that a trial court is responsible for holding the hand of a defendant and walking him or her through the process when he fails to do it. Consistently, the Supreme Court has said it is the moving party's responsibility regardless of whether that is the defendant or the trial court. And if they fail to make that record, it is against that moving party that any inadequacies will be held. In Shaw, however, the defendant made one argument, one factor argument, and that was there had been two African Americans challenged at that point and excused and therefore a pattern existed. He made no other arguments on any of the other factors. In responding to the defendant's challenge, the trial court only addressed the factor the defendant actually raised. This court found error and said that, in fact, he should have addressed all those other factors and articulated them on the record, even though the defendant didn't make it. That is completely alleviating the defendant of his burden. So to the extent that Shaw is contrary to clear Supreme Court rulings, I would ask this court to reconsider. Ms. Johnson, I want to go back to an earlier point you made, which is an interesting one about plain error. Implicit in your argument seems to be the idea that, for lack of a better way to put it, OSAD knows better and I suspect you may be right in that OSAD does an excellent job of presenting arguments on behalf of the people on whose behalf they've been appointed and I think they generally do an excellent job, for instance, in figuring out what arguments have been forfeited at the trial level and what they can argue and how to argue it. So that you're probably right in the case of OSAD that if they don't discuss plain error in their initial brief, it's an election on their part for tactical reasons, waiting to see how you respond and then they will, if you say this has been forfeited in their reply brief, they will say, oh no, it hasn't because it's plain error, etc. The problem is, and I think your approach that you're suggesting to us would be a sound one, if all we dealt with were OSAD briefs, because as I say, OSAD we can hold to a very high standard in that they do, as I say, an excellent job. We have a significant number of briefs, however, to this court on appeals from criminal cases where we have private counsel who, for lack of a better way to put it, routinely do not do as good a job as OSAD does. And we might have some defense attorney on appeal who doesn't really understand this forfeiture concept and is just going ahead and arguing it and will only understand the whole forfeiture argument once you have said, hey, wait a second, this has been forfeited, you can't address it and forget about it. So if we're going to follow your approach, how do we deal with this fairly significant number of cases from the private bar where they literally may not have the understanding of the whole forfeiture process in plain error that OSAD routinely does? Well, initially my response would be the Supreme Court rules apply to all of them. The Supreme Court rules specifically say OSAD versus private counsel. And so if they're going to be practicing before this bar, they should be familiar with the rules that are put before them. Your suggestion would be if the defendant on his initial appeal doesn't say, I acknowledge that this is forfeited, but plain error applies and here's why, that we should not permit them to raise it in a reply brief in response to your saying for the first time in your brief that this argument has been forfeited? That would be in accordance with Supreme Court mandatory rules. And I recognize that there would be extraordinary circumstances where this Court would have that right to say it is a bar on the parties and not on us. And it may be a circumstance where you would ask for additional briefing because the state is put in a position of, you know, by the time if it's not raised until reply, we don't have the record, we don't get the record back. So there are other remedies because of the fact that the bar doesn't apply to you and because you have the right to order supplemental briefing that those could be forfeited. But as you know, Justice Steinman, I was here yesterday on a private counsel case and this issue came up. There was nothing extraordinary about that case that, in my opinion, would have warranted the extra work. And yet this Court rarely disposes of a case based on forfeiture. So again, the state can't put in their brief, okay, the issue is forfeited, and then not make that companion plain error argument because then we're going to be vulnerable to these arguments that forfeiture applies to us. We have to make the argument, but we're making it to a ghost. We're making it in response to a plain error argument that has yet to be made. And we're making it in response to the one that will come in reply. Here, going back to the argument one, during the jury selection, if you follow Davis and Rivera's argument strictly, there was no error here. During the jury selection, the defendant did not make any challenge when the first juror, Mary George, was excused. When the second one was excused, what the defense counsel said is, I would like the Court to recognize that the state has excused two African Americans. In response to that, it was the state that said, excuse me, are you making a Batson challenge here? And the trial court similarly responded, yeah, I'm not clear what's going on here. The defense counsel then said, I'm asking you to make a foundational finding first that there were two African Americans that were excused. And then, yes, I'm making a Batson challenge. There is no evidence in the record, contrary to defendant's assertion, that the trial court denied him an opportunity to present fuller evidence, or that the trial court refused to conduct an inquiry. The record shows that's all that was offered. And based on all that was offered, the trial court responded and found that he had failed to establish a Batson violation. So it is my position that not only did no error occur, no plain error occurred either. For the second argument, I would argue that the trial court properly balanced the rights of both the defendant and the victim and asked that this court would affirm. The defendant argues that the content of those communications go directly to Breonna's ability to consent. I disagree. The trial court here, the record shows, was very clear on what his responsibilities were. He had to balance these two rights that arguably are competing. And he said that he would allow LaComba to testify that he had personal contact with Breonna between 2 and 4.30, that he received phone calls and text messages from her up until 4.30. He could testify to her observations of her when he was at the bar, her physical condition, her ability to have a conversation, was she coherent? All of those things were fair. And all of those things arguably are directly relevant and go to her ability to consent. The actual content of the communications, however, are only going to show and make a suggestion, as the trial court found, that she was promiscuous. There are two exceptions to the rape shield statute. Everyone is in agreement that the first one does not apply because she had no prior history with this defendant. The second one is where it is constitutionally required. And this court has said that for a victim's sexual reputation to be directly relevant and therefore constitutionally required, it must make a meaningful contribution to the fact-finding process. Again, the disclosures of the specific content of her communications with LaComba do not meaningfully aid the fact-finding process of whether she consented to sex several hours later with a completely different person. The evidence that was directly relevant and that was admitted was testimony from LaComba, the cab driver, Bargman, who was the defendant's roommate, and the defendant himself, that Brianna did not appear to be drunk. Testimony from Bargman that Brianna asked where the defendant's bedroom was and made the comment, then, that's where I'm going to sleep. Testimony from Brianna herself that she voluntarily undressed, leaving only underwear and a tank top on. And testimony from LaComba that throughout his communications with her up to 430, she was coherent. In contrast, the content of the text messages the defendant wants is simply going to show she was promiscuous. It is going to show a willingness to engage in sexual activity with somebody else, and it goes to her sexual reputation, and it was properly barred under the rape shield statute. Mr. McCarthy argues that Santos draws a distinction between acts, sexual acts, and communication that address reputation only. What about that? The communications, the rape shield statute applies to acts and reputation, and you are reviewing the trial court's ruling on the balancing on this under a discretionary standard, on a very deferential standard. Well, let me be more clear. He is saying that it doesn't apply to sexual acts, but it does apply to, that Santos stands for, let me put it, besides Santos as explaining the difference between a conversation concerning prior actual sexual activity and a prior false allegation of sex activity. That is distinguishable from the situation that we have here. It is distinguishable from what we have here. We are not making an argument that there was a prior false allegation of any nature, and it is clearly distinguishable from here. And I do not believe, as a matter of law, that communications sexual in nature are allowed under the rape shield statute. What if the tech said, I'll have sex with anybody, a bouncer or bartender that gives me free drinks. You still have to go back to the two exceptions. Is it a text, a communication that could arguably be included to indicate a past evidence of a sexual history between the person that is receiving that and this victim, or is it constitutionally required? Is it directly relevant to the issue at hand here? It is going to have to be on a case-by-case basis based on those two exceptions that are clearly identified as when you can circumvent the rape shield law. The State would ask this Court to affirm. Thank you. Thank you, Your Honors. The first point I would like to make is concerning the forfeiture argument. The first problem, as it pertains to this case anyways, simply not including a Batson challenge in your post-trial motion does not forfeit the issue, according to the Illinois Supreme Court, which is the ultimate arbiter of what its Supreme Court rules mean. The second point is... Wait, wait, wait. Say that again. People being Mitchell, the Illinois Supreme Court said that a Batson error, failure to include a Batson error in a post-trial motion does not in itself result in waiver of the issue because it's an important issue and they want to explain it as such a crucial issue that that's not going to result in waiver. And even if this Court were to consider the State's second argument, that failure to include a forfeiture argument in your opening brief because it violates clear Supreme Court rule, once again the Supreme Court has already weighed in on its own rule and says the State is subject to forfeiture and defense counsel can wait until the reply brief to address plain error. Now as far as the other issue, the rape shield issue, is my argument that the rape shield law simply does not apply. The rape shield law, two very specific parts of evidence of sexual conduct and reputation of the individual. These conversations are not reputation evidence. Reputation is a general opinion of the individual within the community. It's not somebody coming in and saying, oh yeah, she goes home with a different guy every Friday. Everybody knows that. So the rape shield does not apply. What the State is asking this Court to do is to interpret the rape shield law as any evidence that might potentially embarrass the complaining witness in a sexual assault case, we shouldn't go there. I believe the evidence in this case was relevant to her state of mind. It supported my client's version of the events. He has a right to have the jury see the entire picture. It was part of a continuing narrative of the whole evening. It was contemporaneous with the time Brianna was with Jay. It was relevant, should have been admitted, and the trial court was wrong as a matter of law not to let it in. Thank you.